UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

DAVON LEE AND PAUL GARRETT,

                    Plaintiffs,

      -against-

ROBERT BUDDE, JUSTIN LARCHEVESQUE,
AND DANIELLE LONG,

                   Defendants.

------------------------------------------------------------X

**OPINION AND ORDER**

24 Civ. 168 (JCM)

Plaintiffs Davon Lee and Paul Garrett (collectively, "Plaintiffs") commenced this action pursuant to 42 U.S.C. §§ 1983 and 1988 against Defendant Robert Budde, a police officer with the Village of Buchanan Police Department, and Defendants Justin Larchevesque and Danielle Long, police officers with the Peekskill Police Department (collectively, "Defendants"). (Docket No. 1). Presently before the Court are (1) Defendants Larchevesque's and Long's (collectively, "Peekskill Defendants") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, (Docket No. 49), accompanied by a memorandum of law in support of the motion, (Docket No. 52) (together, "Peekskill Motion"); and (2) Defendant Budde's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, (Docket No. 61), accompanied by a memorandum of law in support of the motion, (Docket No. 63) (together, "Budde Motion"). Plaintiffs filed oppositions to the Peekskill and Budde Motions, (Docket Nos. 57, 68), and the Peekskill Defendants and Defendant Budde filed replies, (Docket Nos. 54, 65).

For the reasons set forth below, Defendant Budde's and the Peekskill Defendants' motions for summary judgment are denied in their entirety.[1]

## I. BACKGROUND

### A. Relevant Facts

The following facts, based on evidence submitted in support of Defendants' motions and Plaintiffs' oppositions,[2] are construed in the light most favorable to Plaintiffs as the party opposing summary judgment. *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018). Any disputes of material fact are noted.

### 1. Plaintiffs' Arrival at Da-Ro's and Encounter with Thompson[3]

On June 28, 2023, Plaintiffs arrived at Da-Ro's Deli, a convenience store owned by Hesham Saleh in the Village of Buchanan, to pick up a U-Haul truck they had rented for a junk-removal job in Peekskill. (Pl. 56.1 Budde Resp. ¶¶ 67, 74-75[4]). Customers could rent U-Haul trucks in person through the convenience store or by an online system. (*Id.* ¶ 71). Plaintiffs disagree on when they arrived at the parking lot. Plaintiff Garrett testified that they arrived around 5:45 p.m., and Plaintiff Lee testified that they arrived around 8:00 p.m. (*Id.* ¶¶ 2-3).

---

[1] The parties have consented to the undersigned for all purposes, pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Docket No. 29).

[2] Specifically, the facts are taken from (1) the Peekskill Defendants' and Defendant Budde's Statements of Material Facts, submitted pursuant to Local Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York, (Docket Nos. 50, 64, respectively), (2) Plaintiffs' Counterstatements to the Peekskill Defendants' and Defendant Budde's Statements of Material Facts, (Docket Nos. 55, 66, respectively), and (3) the affidavits and exhibits submitted by the parties in support thereof. All page number citations herein refer to the page number assigned upon electronic filing unless otherwise noted.

[3] The Peekskill Defendants adopt Defendant Budde's Statement of Material Facts, (Docket No. 64), with respect to the events preceding their response to Defendant Budde's call for assistance, (*see* Docket No. 50 at 1).

[4] Plaintiffs' Counterstatements to the Peekskill Defendants' and Defendant Budde's Statements of Material Facts each include a section titled "*Plaintiffs' Additional Material Facts as to Which it is Contended That There Exists a Genuine Issue to be Tried.*" (Docket Nos. 55 ¶¶ 65-344; 66 ¶¶ 62-341). These sections are identical in the respective Counterstatements except for the paragraph numbers.

Upon arrival, Plaintiff Lee inspected the U-Haul he reserved and attempted to complete the reservation to obtain the keys. (*Id.* ¶ 78).  As part of the inspection, Plaintiff Lee entered the cab and back of the truck, which was unlocked, to check for damage and equipment that was included with the rental. (*Id.* ¶¶ 79-81).  Plaintiff Garrett also entered the cab of the truck. (*Id.* ¶ 83).  Plaintiff Lee testified during his deposition that it was "protocol to inspect the U-Haul before you actually pull off with it." (Docket No. 67-11 at 47:18-20).  Plaintiff Lee estimated that he and Plaintiff Garrett were inside the truck's cab for five to seven minutes; Plaintiff Garrett estimated they were inside for approximately ten to fifteen minutes. (Pl. 56.1 Budde Resp. ¶¶ 84-85).

During the inspection, Plaintiff Lee received messages from U-Haul indicating there was a problem with his reservation. (*Id.* ¶ 86).  At 8:23 p.m., he was directed to call U-Haul, (*id.* ¶ 87; Docket No. 67-22 at 2), and he spoke to a representative who informed him of an issue with an existing balance that needed to be cleared before the rental process could be completed, (Pl. 56.1 Budde Resp. ¶ 87).  Plaintiff Lee was unable to resolve the issue and cancelled his reservation at 8:37 p.m. (Docket No. 67-22 at 2).  Then he attempted to rent the truck in Plaintiff Garrett's name, but was unsuccessful. (Pl. 56.1 Budde Resp. ¶¶ 90-92).  Plaintiffs assert they did not reenter the U-Haul truck after Plaintiff Lee's call with the representative. (*Id.* ¶ 89).

At some point after Plaintiffs arrived, Deborah Thompson walked by them on her way to get cigarettes from Da-Ro's, (*id.* ¶ 101), and asked Plaintiffs what they were doing, (Def. Budde 56.1 ¶ 10).  Thompson asserts she had been watching Plaintiffs open the back and front of the truck, and enter the cab of the truck, for twenty to thirty minutes from her cousin's porch, which was located directly across the road from the parking lot and the U-Haul Plaintiffs were

attempting to rent. (*Id.* ¶¶ 15-18).[5]  She told Plaintiffs that the owner of Da-Ro's lived inside the building and they could knock on the door if they needed assistance. (Docket No. 67-14).[6] Plaintiffs explained to Thompson that they were renting a U-Haul via an app on their phone and did not need help. (Def. Budde 56.1 ¶ 11; Docket Nos. 67-14; 67-6 at 41:16-17).  After the interaction with Thompson, since they were unable to rent the U-Haul, Plaintiffs ordered an Uber and left Da-Ro's to wait for their driver. (Pl. 56.1 Budde Resp. ¶ 93).  After Plaintiff Lee called the Uber, Plaintiff Garrett observed a police vehicle drive pass them. (*Id.* ¶¶ 12, 95).  Plaintiffs contend they were in the parking lot for at least an hour after Da-Ro's closed at 8:00 p.m. and before their encounter with Defendant Budde at 9:21 p.m. (*Id.* ¶¶ 4, 13, 41).

## 2. Thompson's Call to Police and Defendant Budde's Initial Investigation

At 9:02 p.m., Thompson called the Village of Buchanan Police Department, (Docket No. 67-20), while driving home from her cousin's house, to report two men she had seen "near rentable uhaul trucks behind daro's deli," (Docket No. 67-14).  She thought this was "suspicious." (*Id.*).  Thompson initially stated to Defendant Budde, who answered, that she called the police to investigate because she was "worried [about] recent vehicle break ins in the area," (*id.*), and later testified at her deposition that she also had concerns for her cousin's safety, (Docket No. 67-6 at 52:4-53:25; 59:8-12; 63:25-64:10; 65:14-19).

Defendant Budde maintains that Thompson told him Plaintiffs were "looking underneath

---

[5] Defendant Budde's Statement of Material Facts states that Thompson testified she first observed Plaintiffs around 3:30 p.m. (Def. Budde 56.1 ¶ 14).  However, Thompson's supporting deposition avers that she saw "two black males near rentable uhaul trucks behind daro's deli" at "approximately 6pm." (Docket No. 67-14).  Plaintiff Lee testified that Plaintiffs did not arrive at Da-Ro's until approximately 8:00 p.m. (Pl. 56.1 Budde Resp. ¶ 14).

[6] Defendant Budde states that Thompson told Plaintiffs they could go inside Da-Ro's if they needed help. (Def. Budde 56.1 ¶ 20).  Plaintiffs admit that Thompson *testified* that she told the two men they could do so, but dispute that she ever said this. (Pl. 56.1 Budde Resp. ¶ 20).  In her supporting deposition, Thompson stated that she told the two men they could knock on Mr. Saleh's residential door for assistance, as Da-Ro's closed at 8:00 p.m. (*Id.* ¶¶ 108-09; Docket No. 67-14).

the dash and moved things around inside the U-Haul." (Def. Budde 56.1 ¶ 34).  Plaintiffs dispute this, as Thompson denied telling Defendant Budde that "she had observed the two men looking under the dash, rearranging the seats, or rolling down the window of any vehicle." (Pl. 56.1 Budde Resp. ¶¶ 34, 136).  In addition, Defendant Budde testified that Plaintiffs told Thompson "they were waiting for keys." (Def. Budde 56.1 ¶ 35).  Plaintiffs dispute Thompson told Defendant Budde this, citing Thompson's deposition testimony that she did not tell Defendant Budde about the earlier conversation she had with the two men. (Docket No. 67-6 at 66:18-23; 70:21-71:2; Pl. 56.1 Budde Resp. ¶¶ 35, 134).  Defendant Budde also testified in his deposition that he asked Thompson what led her to believe the two men intended to steal the vehicle, (Pl. 56.1 Budde Resp. ¶ 152; Docket No. 67-8 at 41:2-3), but Thompson denied this and said that Defendant Budde did not ask her any questions during their three-to-four-minute call, (Pl. 56.1 Budde Resp. ¶ 152; Docket No. 67-6 at 65:6-68:15).  Given these contradictions, Plaintiffs maintain that what transpired during Thompson's conversation with Defendant Budde is in dispute and "a matter of credibility for the jury." (Pl. 56.1 Budde Resp. ¶ 35).

Defendant Budde further testified that approximately seven minutes after speaking with Thompson, he drove past the U-Haul and observed Plaintiffs Lee and Garrett sitting in the cab of the truck. (Def. Budde 56.1 ¶¶ 36-37; Docket No. 67-8 at 70:7-18).  Plaintiffs dispute this testimony, noting that Defendant Budde's contemporaneous incident report omits any reference to this drive-by and, moreover, they "were not in the vehicle at any point after [P]laintiff Lee spoke to the U-Haul representative and learned that he owed a balance." (Pl. 56.1 Budde Resp. ¶¶ 36-37).  Defendant Budde maintains that he drove past the U-Haul twice more and observed the same, then stayed in the area for approximately an hour. (Def. Budde 56.1 ¶¶ 38-39).  Plaintiffs dispute what Defendant Budde observed during these additional drives past the U-

Haul, as well as his assertion that he remained in the area for an hour. (Pl. 56.1 Budde Resp. ¶¶ 38-39).

Defendant Budde testified that he then drove to a Dunkin' Donuts parking lot with a "limited view" of the parking lot behind Da-Ro's deli, and he could no longer see the U-Haul vehicle in which he said he first observed Plaintiffs sitting. (*Id.* ¶¶ 176, 179; Docket No. 67-8 at 82:1-7). While in the Dunkin' Donuts parking lot, Defendant Budde said he attempted to contact the proprietor of Da-Ro's as part of his investigation and "had already concluded that the two men he had observed were unlawfully occupying the U-Haul vehicle." (Pl. 56.1 Budde Resp. ¶¶ 181-82; Docket No. 67-8 at 75:4-76:7). However, he never called the owner, Mr. Saleh, because the police department's "business contact book" was not updated with the new owner's contact information. (Pl. 56.1 Budde Resp. ¶ 183; Docket No. 67-8 at 76:8-77:6). Defendant Budde did not recall if he used his work phone "to conduct a web search for a contact phone number for the owner of Da-Ro's deli or to investigate the means by which an individual could rent a U-Haul vehicle," and his incident report does not include any reference to him doing so. (Pl. 56.1 Budde Resp. ¶¶ 199-200).

Plaintiffs dispute both the scope of Defendant Budde's alleged investigation, (*id.* ¶¶ 38, 163-214), and the duration, (*id.* ¶¶ 39, 215-21). The phone log for the Village of Buchanan Police Department shows Thompson's only incoming call to the police took place at 9:02 p.m. (*Id.* ¶ 218). Defendant Budde testified that he spoke with Thompson twice more before observing Plaintiffs walking in the direction of the Gallon Measure Repair Station. (*Id.* ¶¶ 202-03, 211, 213). Defendant Budde said Thompson first called him back to report that Plaintiffs were still sitting in the U-Haul. (Pl. 56.1 Budde Resp. ¶¶ 202-03; Docket No. 67-8 at 82:13-17). However, he also testified that he called Thompson back during his second drive by. (Docket No.

67-8 at 133:11-12).  Plaintiffs dispute that Defendant Budde had additional conversations with Thompson prior to engaging them, as his incident report does not reference Thompson calling him back after her initial call to the police. (Pl. 56.1 Budde Resp. ¶ 205).  In addition, while Defendant Budde stated the second call lasted "[a] few minutes," he did not recall how long the alleged third conversation was, nor anything else Thompson said during either of the purported calls. (*Id.* ¶¶ 202-05, 211-12).  Thompson also testified that the only conversation she had with Defendant Budde after her initial call was when he called her (or her cousin) back to report that Plaintiffs had been released. (Docket No. 67-6 at 73:9-75-13).  Moreover, according to the police phone log, there were two outgoing calls to Thompson at 9:15 p.m. and 9:58 p.m. (Docket No. 67-20).  Defendant Budde's bodycam footage shows he first approached Plaintiffs at 9:21 p.m., indicating nineteen minutes had elapsed between when Thompson initially called the police and when Defendant Budde encountered Plaintiffs. (*Id.* ¶¶ 41, 217-18).

### 3.  Defendants' Alleged Unlawful Stop, Seizure, Arrest, and Search of Plaintiffs

Defendant Budde asserts he made his first radio call for assistance from the Peekskill Police Department after he initially saw Plaintiffs in the U-Haul, reporting his location and intent to engage Plaintiffs "whom he suspected of criminal trespass and tampering." (Peekskill Defs. 56.1 ¶¶ 5-6).  Plaintiffs dispute the timing of the initial radio call, as Defendant Budde testified at his deposition that the initial radio call was "after the second drive by." (Pl. 56.1 Peekskill Resp. ¶ 5; Docket No. 67-8 at 137:24-138:2).  Plaintiffs also dispute that Defendant Budde suspected them of criminal trespass and criminal tampering or that he reported this over the radio, as his testimony only refers to calling the Peekskill Police Department to report two "suspicious males" without indicating that he thought they had committed any crimes. (Pl. 56.1 Peekskill Resp. ¶ 6; Docket No. 67-8 at 139:18-140:6).

When Defendant Budde approached Plaintiffs at 9:21 p.m., they ignored his first two attempts to speak with them and repeated requests for identification. (Pl. 56.1 Budde Resp. ¶¶ 42-43). Defendant Budde asserts he "informed Plaintiffs they were stopped in response to a call that they were seen inside a U-Haul after business hours and were trespassing on private property." (Def. Budde 56.1 ¶ 44). Plaintiffs dispute Defendant Budde said this when he approached them. (Pl. 56.1 Budde Resp. ¶ 44). In support of this assertion, they cite to Defendant Budde's deposition testimony that he first said to Plaintiffs "What's going on, fellas?" and when they did not respond, he asked them for identification. (Docket No. 67-8 at 143:18-144:17). Plaintiff Lee told Defendant Budde that it was "none of his business what they were doing inside the U-Haul vehicle," and that he "did not have to answer whether that was an admission that he was inside the U-Haul." (Def. Budde 56.1 ¶¶ 45, 47).

Defendant Budde asserts that he informed Plaintiffs they were not free to leave. (*Id.* ¶ 49). Plaintiffs dispute this, noting that Defendant Budde simply stated "I'm not leaving and neither are you guys," but "made no other statement advising Plaintiffs that they were not free to leave." (Pl. 56.1 Budde Resp. ¶ 49). Plaintiff Lee repeatedly stated that they intended to leave once their Uber arrived and that they believed Plaintiffs did not have to comply with Defendant Budde's commands because he lacked a lawful basis to stop them. (*Id.* ¶¶ 50-51, 240). After this initial encounter, Defendant Budde made his second call for police assistance. (Pl. 56.1 Peekskill Resp. ¶ 7). According to Defendant Budde's bodycam footage, Plaintiff Lee told him that Plaintiffs had been renting a U-Haul and that once their Uber arrived they would be "out of here," to which Defendant Budde responded "Alright." (Pl. 56.1 Budde Resp. ¶¶ 241-42).

At 9:30 p.m., Plaintiffs walked away from Defendant Budde and towards their Uber. (Def. Budde 56.1 ¶ 53). Plaintiffs assert that Defendant Budde observed them walking away but

said nothing to them and made no attempt to prevent them from leaving. (Pl. 56.1 Budde Resp. ¶ 244). Defendant Larchevesque was the first officer from the Peekskill Police Department to arrive, (Def. Budde 56.1 ¶ 54), and he claims Plaintiffs were "attempting to leave against Officer Budde's direction," (Peekskill Defs. 56.1 ¶ 14). However, Plaintiffs maintain that Defendant Larchevesque was not aware of any such instructions from Defendant Budde. (Pl. 56.1 Peekskill Resp. ¶ 14). The parties also disagree on what Defendant Budde told Defendant Larchevesque when he arrived on the scene. Defendant Larchevesque maintains Defendant Budde said "two males were attempting to get into a car and flee the area." (Peekskill Defs. 56.1 ¶ 16). Defendant Budde's bodycam footage records him as saying: "These two guys were inside the U-Haul. I went to go stop them, they won't give me ID and now their Uber's right there." (Pl. 56.1 Peekskill Resp. ¶ 16). Following this conversation, Defendant Larchevesque drove towards Plaintiffs to prevent them from leaving. (Def Budde. 56.1 ¶ 55).

Defendant Long arrived on the scene at 9:31 p.m. (Pl. 56.1 Budde Resp. ¶ 251). She observed two subjects she believed were attempting to get into a vehicle. (*Id.* ¶ 252). At this point, Defendant Larchevesque told Plaintiffs they were not free to leave. (Peekskill Defs. 56.1 ¶ 24). Defendant Larchevesque then advised Plaintiff Lee that he was being detained because Defendant Budde "told [him] to stop and asked for [his] ID and [he] said 'no.'" (Pl. 56.1 Budde Resp. ¶ 255). Defendant Larchevesque asked Plaintiff Lee twice to take his hands out of his pockets and place them on the rear of the car. (Pl. 56.1 Peekskill Resp. ¶¶ 27-28). Plaintiff Lee did not comply. (*Id.* ¶ 28). Then, Defendant Larchevesque, with Defendant Long's assistance, handcuffed Plaintiff Lee, (Pl. 56.1 Budde Resp. ¶ 256), and conducted a pat down of his outer garments for weapons, (Peekskill Defs. 56.1 ¶ 31). No weapons were found. (*Id.*). While Defendant Larchevesque was handcuffing Plaintiff Lee, he said that Plaintiff Lee "tens[ed] his

arms to squeeze the officer's hands against his body and refus[ed] to turn around and stay with his hands on the car." (*Id.* ¶ 38).

Defendant Larchevesque testified that Plaintiff Lee was argumentative and aggressive, so he tried to turn him to face away from him. (*Id.* ¶ 37).  The Peekskill Defendants maintain that Defendant Larchevesque handcuffed Plaintiff Lee for officer safety. (*Id.* ¶ 30).  Plaintiffs dispute that Defendant Larchevesque was concerned with officer safety. (Pl. 56.1 Peekskill Resp. ¶¶ 30, 37).  After Plaintiff Lee was detained in handcuffs, he told Defendant Larchevesque that he had a U-Haul reservation and that he intended to sue the responding police officers. (Pl. 56.1 Budde Resp. ¶ 314).  Defendant Long testified that she heard Plaintiff Lee offer to show his reservation on the bodycam video footage played during her deposition, but that she did not recall hearing this statement at the time of the incident. (Docket No. 67-9 at 65:21-66:10).  However, she stated this was "not really" relevant to her assessment of what was going on at the time Plaintiffs were being handcuffed because "this was Officer Budde's investigation [and] [h]e obviously had information we did not have." (*Id.* at 66:11-67:9).

As Defendant Larchevesque was handcuffing Plaintiff Lee, Plaintiff Lee's backpack fell to the ground with the strap remaining around his feet. (Pl. 56.1 Budde Resp. ¶ 271).  Defendant Larchevesque removed the strap and placed the backpack on top of the Uber that Plaintiff Lee was standing against. (*Id.* ¶ 272).  Defendant Larchevesque testified that the backpack made a "banging noise" as he placed it on the roof of the car and he suspected a weapon may be inside it. (*Id.* ¶¶ 274, 278).  Plaintiffs state that no audio of a "banging sound" can be heard on either Defendant Larchevesque's or Defendant Budde's bodycam footage during the relevant timeframe. (*Id.* ¶ 277).  Further, Defendant Larchevesque did not advise any officers at the scene that he was concerned there may be a weapon in the backpack. (*Id.* ¶ 281).

When Defendant Budde arrived at the Uber,[7] he instructed Plaintiff Garrett to place his hands on the rear of the Uber. (*Id.* ¶ 258). Plaintiff Garrett immediately complied. (*Id.*). Defendant Budde then assisted Defendant Long in handcuffing Plaintiff Garrett, who did not resist. (*Id.* ¶¶ 57, 256, 260). While handcuffing Plaintiff Garrett, Defendant Budde conducted a pat down, "ostensibly to search for weapons." (*Id.* ¶ 261). Defendant Budde testified that he observed something heavy causing Plaintiff Garrett's sweatshirt to be weighed down. (*Id.* ¶ 262). However, when he ran his hand along the outside of the sweatshirt he determined that the item in the pocket was not a weapon. (*Id.* ¶ 263). He then reached into Plaintiff Garrett's pocket to remove the item, which was an electronic device. (*Id.* ¶ 264). After Plaintiff Garrett was securely handcuffed, Defendant Long conducted another pat down. (*Id.* ¶ 265). She reached into his pocket and removed his mobile phone, which she placed on the ground at his feet. (*Id.* ¶ 267).

Defendant Long "understood it was her responsibility to assist in identifying the individuals; remain until the investigation was complete; and to ensure that no weapons were present to jeopardize officer safety."[8] (Peekskill Defs. 56.1 ¶ 45). Approximately two minutes after Defendant Larchevesque placed Plaintiff Lee's backpack on the roof of the Uber, Defendant Long removed the backpack, which she testified was heavy. (*Id.* ¶ 51; Pl. 56.1 Budde Resp. ¶ 282). During her deposition, Defendant Long explained that she moved the backpack away from Plaintiff Lee so he could not access it in case it contained a weapon. (Pl. 56.1 Budde Resp. ¶ 283). Plaintiffs dispute that Defendant Long thought the backpack was heavy and question whether she was searching for weapons. (Pl. 56.1 Peekskill Resp. ¶ 50). Defendant

---

[7] The parties dispute when Defendant Budde arrived at the Uber. Defendant Budde asserts Plaintiff Lee was already in handcuffs by the time he caught up to Plaintiffs and the Peekskill Defendants. (Def. Budde 56.1 ¶ 56). Plaintiffs disagree, submitting that Plaintiff Lee was in the process of being handcuffed when Defendant Budde arrived at the Uber. (Pl. 56.1 Budde Resp. ¶ 56).

[8] Defendant Long "was trained in conducting a *Terry* Stop, including the use of handcuffs and searching bags in order to ensure officer safety." (Peekskill Defs. 56.1 ¶ 42).

Long can be heard saying on her bodycam video that she moved the backpack because she "did not want it to fall off of the Uber in the event that the driver moved the vehicle." (Pl. 56.1 Budde Resp. ¶ 284; Docket No. 67-17 at 3:30-3:35).

Defendant Long then unzipped the bag and inspected the contents with a flashlight, finding no weapon. (Peekskill Defs. 56.1 ¶ 52). She observed paperwork, which she checked to see if it included a reservation for the U-Haul, and a smaller cross-body bag, which she also inspected for weapons pursuant to her training. (*Id.* ¶¶ 53-55). Plaintiffs dispute that Defendant Long's search of the cross-body bag was consistent with a weapons search, (Pl. 56.1 Peekskill Resp. ¶ 54), because Defendant Long testified that she "did not recall any observations that she made about the smaller bag, its weight, or its palpable quality when she removed it from the larger backpack," (Pl. 56.1 Budde Resp. ¶ 300). She also said that she "did not recall what if anything she was searching for" in unzipping and looking into the various pockets of the smaller bag. (*Id.* ¶¶ 306-07).

Two other officers – Peekskill Police Officer Nappi, accompanied by a police canine, and Detective Fabian Gonzalez – arrived at the location by 9:32 p.m. (*Id.* ¶¶ 308-12). They remained at the scene for the entire time that Plaintiffs were handcuffed. (*Id.* ¶ 318). Three marked Peekskill Police Department vehicles and an unmarked police car, all with their emergency lights activated, were also at the location and visible to Plaintiffs while they were in handcuffs. (*Id.* ¶ 313).

Defendant Budde continued with his investigation after both Plaintiffs were handcuffed. (Peekskill Defs. 56.1 ¶ 56). The investigation took approximately ten minutes. (Def. Budde 56.1 ¶ 58). Defendant Budde spoke to Mr. Saleh, (Pl. 56.1 Budde Resp. ¶¶ 319-21), who told him that Plaintiffs did not have permission to be inside the U-Haul, (Def. Budde 56.1 ¶ 59).

Defendant Budde then inspected the U-Haul vehicle with Mr. Saleh. (Pl. 56.1 Budde Resp. ¶ 322).  Thereafter, he told Mr. Saleh that he was "just going to ID [Plaintiffs] and let them go, even though they were on your private property after hours." (*Id.*).  Defendant Budde asked Mr. Saleh if he wanted Plaintiffs on his property. (*Id.* ¶ 323).  Mr. Saleh responded that he did not, if they did not have a reservation. (*Id.* ¶ 324).  Defendant Budde and Mr. Saleh then attempted to determine if Plaintiffs had made a U-Haul reservation, but were unable to do so because of an internet outage. (*Id.* ¶ 325).  Defendant Budde returned to where Plaintiffs were seated, still handcuffed, and advised them that Mr. Saleh did not have a reservation under either of their names and that he wanted them off his property. (*Id.* ¶¶ 326-28).  Plaintiffs maintain that Mr. Saleh did not know who they were, but had no opinion as to whether he wanted them on his property. (Pl. 56.1 Peekskill Resp. ¶ 57).  Rather, Plaintiffs assert Mr. Saleh said he did not know if they were good or bad people, or if they had a U-Haul reservation, (*id.*), but that he would have no problem with them being there "if they would be good," i.e., if they had a reservation, (Docket Nos. 67-7 at 54:3-22; 67-16 at 17:35-17:50).

Defendant Budde concluded his investigation and released Plaintiffs.[9] (Def. Budde 56.1 ¶ 61).  Defendant Larchevesque maintains he was not involved in Defendant Budde's investigation and removed Plaintiff Lee's handcuffs at Defendant Budde's direction. (Peekskill Defs. 56.1 ¶ 64).  Plaintiff Garrett testified that he and Plaintiff Lee were in handcuffs for approximately ten to eleven minutes, and that they showed Defendant Budde a purported U-Haul reservation from his phone after he told them they were free to go. (*Id.* ¶¶ 60, 65).  Plaintiff Lee had an online reservation for a U-Haul for 7:45 p.m. on June 28, 2023 at Da-Ro's Deli. (Pl. 56.1 Budde Resp. ¶

---

[9] Mr. Saleh requested that Defendant Budde let Plaintiffs go, (Def. Budde 56.1 ¶ 60), but Plaintiffs assert it was Defendant Budde's decision to release Plaintiffs, (Pl. 56.1 Budde Resp. ¶ 330).

333; Docket No. 67-21).

## B.  Procedural History

Plaintiffs commenced this lawsuit on January 9, 2024. (Docket No. 1).  The Peekskill Defendants served their motion, (Docket No. 49), accompanied by a memorandum of law in support, (Docket No. 52), a Statement of Material Facts pursuant to Local Civil Rule 56.1, (Docket No. 50), and an affidavit of Paul E. Svensson, (Docket No. 51), with multiple exhibits attached thereto.  Plaintiffs filed their opposition to the Peekskill Motion, (Docket No. 57), which included their response to the Peekskill Defendants' Rule 56.1 Statement of Material Facts, (Docket No. 55), and an affidavit of Russell G. Wheeler, (Docket No. 56), with multiple exhibits attached thereto.  The Peekskill Defendants filed a reply. (Docket No. 54).

Defendant Budde filed a motion for summary judgment, (Docket No. 61), accompanied by a memorandum of law in support, (Docket No. 63), a Statement of Material Facts pursuant to Local Civil Rule 56.1, (Docket No. 64), and an affidavit of Alex J. Ru, (Docket No. 62), with multiple exhibits attached thereto.  Plaintiffs filed their opposition to the Budde Motion, (Docket No. 68), which included their response to Defendant Budde's Rule 56.1 Statement of Material Facts, (Docket No. 66), and an affidavit of Russell G. Wheeler, (Docket No. 67), with multiple exhibits attached thereto.  Defendant Budde filed a reply. (Docket No. 65).

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute as to a material fact "exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the nonmovant's

favor." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247-48 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Casalino v. N.Y. State Catholic Health Plan, Inc.*, No. 09 Civ. 2583 (LAP), 2012 WL 1079943, at *6 (S.D.N.Y. Mar. 30, 2012) (citation and internal quotations omitted).

In reviewing a motion for summary judgment, the court "must draw all reasonable inferences in favor of the nonmoving party" and "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (citations omitted). That said, the court may not weigh the evidence or determine the truth of the matter, but rather conducts "the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250. The moving party bears the initial burden of "demonstrating the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). Under federal law, the moving party may meet this burden by pointing to the absence of evidence to support an essential element of the nonmoving claim. *See Tenay v. Culinary Teachers Ass'n of Hyde Park*, 281 F. App'x 11, 12-13 (2d Cir. 2008) (summary order) ("[T]he moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.") (citation and internal quotations omitted); *see also Hughes v. United States*, No. 12 Civ. 5109 (CM), 2014 WL 929837, at *4 (S.D.N.Y. Mar. 7, 2014) (holding that a defendant may meet its burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case," but need not "raise a *prima facie* case") (quoting *Celotex*, 477 U.S. at 325).

Once the moving party has met its initial burden, the burden shifts to the nonmoving party to "present evidence sufficient to satisfy every element of the claim." *Holcomb*, 521 F.3d at 137. "The non-moving party is required to 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial,'" *id.* (quoting *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 249-50), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In doing so, "the nonmovant may not rely on conclusory allegations or unsubstantiated speculation, but must support the existence of an alleged dispute with specific citation to the record materials." *Hughes*, 2014 WL 929837, at *3 (citations and internal quotations omitted); *see also* Fed. R. Civ. P. 56(c). Additionally, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. If the nonmoving party fails to establish the existence of an essential element of the case on which it bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

In the Southern District of New York, the party moving for summary judgment must submit a short and concise statement of material facts it contends are undisputed, and supported by evidence that would be admissible at trial. Local Civ. R. 56.1. The party opposing summary judgment must specifically controvert the moving party's statement of material facts, or the moving party's facts will be deemed admitted for purposes of the motion. Local Civ. R. 56.1(c); *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."). However, "allegations of uncontested fact cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement." *Holtz v.*

*Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001), *abrogated on other grounds by Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218 (2d Cir. 2024). "[W]here there are no[] citations or where the cited materials do not support the factual assertions in the [s]tatements, the [c]ourt is free to disregard the assertion." *Id.* (citations and internal quotations omitted). The court has discretion to conduct an assiduous review of the record even where one of the parties has failed to file such a statement. *Smith v. Yvonne*, 18 Civ. 3371 (JCM), 2023 WL 5152690, at *4 (S.D.N.Y. Aug. 10, 2023) (internal citation and quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3). Nevertheless, the court is not required to consider what the parties fail to point out." *Id.* (citing *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)).

## III. DISCUSSION

Plaintiffs assert that Defendants violated their Fourth Amendment rights to be free from unlawful search and seizures when they were stopped, handcuffed for approximately ten minutes, and had their persons and belongings searched after unsuccessfully attempting to rent a U-Haul vehicle.

Defendant Budde seeks summary judgment on the grounds that: (1) Plaintiffs were not seized under the Fourth Amendment because their encounter with him was a permissible investigatory stop; (2) even if the encounter was a seizure, it was supported by probable cause; (3) Plaintiffs were not subjected to an unreasonable search in violation of their Fourth Amendment rights; (4) Plaintiffs' claims are barred under the doctrine of qualified immunity; and (5) punitive damages are inappropriate. (Docket No. 63 at 2). The Peekskill Defendants seek summary judgment on the grounds that: (1) the investigatory stop was supported by reasonable suspicion and did not evolve into an arrest; (2) they are entitled to qualified immunity on Plaintiffs' constitutional claims; (3) there is no basis to support a punitive damages claim; and

(4) the search by Defendant Long was reasonable under the circumstances. (Docket No. 52 at 2).

## A.  Fourth Amendment Claims

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Under the Fourth Amendment, a seizure occurs when there is "*either* the application of physical force, ... *or*, where that is absent, submission to an officer's 'show of authority' to restrain the subject's liberty." *Cal. v. Hodari D.*, 499 U.S. 621, 621 (1991) (emphasis in original).  The Second Circuit has held that "'an order to stop must be obeyed or enforced physically to constitute a seizure.'" *United States v. Cuthbert*, 466 F. App'x 46, 46-47 (2d Cir. 2012) (quoting *United States v. Baldwin*, 496 F.3d 215, 218 (2d Cir. 2007)).  In other words, "there is no seizure without actual submission." *Id.* at 47 (quoting *Baldwin*, 496 F.3d at 218); *see also Brendlin v. Cal.*, 551 U.S. 249, 254 (2007).  Courts must be "objective" when evaluating the reasonableness of a particular seizure, specifically considering whether "the facts available to the officer at the moment of the seizure ... warrant a man of reasonable caution in the belief that the action taken was appropriate." *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968) (internal quotations omitted).  The Fourth Amendment "governs 'seizures' ... which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional terminology.  It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Id.* at 16.

## 1.  Unlawful Investigatory (*Terry*) Stop

Defendant Budde argues that he had reasonable suspicion to stop Plaintiffs "based on information provided by citizen Thompson and his own personal observations confirming [the] same," and thus, is entitled to summary judgment. (Docket No. 63 at 11).  Plaintiffs contend

material issues of fact exist relating to the information Defendant Budde relied upon to support his alleged reasonable suspicion that precludes summary judgment. (Docket No. 68 at 22-23).

"Police stops fall into two categories: arrests and *Terry* stops." *Grice v. McVeigh*, 873 F.3d 162, 166-67 (2d Cir. 2017). Under the Fourth Amendment, a police officer may conduct a *Terry* stop "as long as the officer has reasonable suspicion 'that the person to be detained is committing or has committed a criminal offense.'" *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016) (quoting *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014)). "The suspicion must derive from specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing." *Id.* (internal quotation marks and citation omitted). "In assessing the reasonableness of an officer's suspicion," courts must consider "'the totality of the circumstances' and must 'evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" *Id.* (quoting *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000)).

"[F]or a stop to be conducted in an appropriate manner, not only must it be no longer in duration than necessary to confirm or dispel officers' reasonable suspicions; the stop must also employ the least intrusive means reasonably available to effect ... legitimate investigative purposes." *United States v. Patterson*, 25 F.4th 123, 141 (2d Cir. 2022) (internal quotations omitted). "Any events that occur after a stop is effectuated cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013).

Here, the record demonstrates material issues of fact exist as to whether Defendant Budde had reasonable suspicion to detain Plaintiffs in the first instance. Defendant Budde attests that he

developed reasonable suspicion "based on a citizen complaint." (Docket No. 63 at 9). However, there are contrasting versions of what information Thompson told Defendant Budde in their three-to-four-minute 911 call. Defendant Budde asserts that Thompson told him Plaintiffs were "looking underneath the dash and moved things around inside the U-Haul." (Def. Budde 56.1 ¶ 34). Yet, Thompson testified that she did not tell Defendant Budde "she had observed the two men looking under the dash, rearranging the seats, or rolling down the window of any vehicle." (Pl. 56.1 Budde Resp. ¶¶ 34, 136; Docket No. 67-6 at 71:3-7). In addition, Defendant Budde testified that Thompson told him Plaintiffs said "they were waiting for keys." (Def. Budde 56.1 ¶ 35). However, Thompson testified at her deposition that she did not tell Defendant Budde about the earlier conversation she had with the two men. (Pl. 56.1 Budde Resp. ¶¶ 35, 134, 138; Docket No. 67-6 at 66:18-23; 70:21-71:2). Thompson also said that Defendant Budde did not ask her any questions during their call. (Pl. 56.1 Budde Resp. ¶ 152).

Moreover, there are factual disputes regarding Defendant Budde's testimony regarding what Thompson said to him regarding her observation of Plaintiffs inspecting the U-Haul. Defendant Budde states that Thompson told him she first observed Plaintiffs around 3:30 p.m., (Def. Budde 56.1 ¶ 14), but her supporting deposition avers that she saw "two black males near rentable uhaul trucks behind daro's deli" at "approximately 6pm," (Docket No. 67-14). In addition, Plaintiff Lee testified that Plaintiffs did not arrive at Da-Ro's until approximately 8:00 p.m., which puts into question all the parties' testimony. (Pl. 56.1 Budde Resp. ¶ 14).

Defendant Budde also maintains that he developed reasonable suspicion "based on his own personal observations." (Docket No. 63 at 9). However, there are material issues of fact regarding what Defendant Budde actually observed, and for how long, prior to approaching Plaintiffs at 9:21 p.m. Thompson's incoming call to the police occurred at 9:02 p.m., which was

only nineteen minutes before Defendant Budde approached Plaintiffs. (Pl. 56.1 Budde Resp. ¶ 218). Yet, Defendant Budde asserts that after speaking with Thompson he stayed in the area for an hour and drove past the U-Haul three times before approaching Plaintiffs. (Def. Budde 56.1 ¶¶ 36-39). Further, Defendant Budde testified that during this hour, Thompson called him back to report that Plaintiffs were still sitting in the U-Haul. (Pl. 56.1 Budde Resp. ¶¶ 202-03; Docket No. 67-8 at 82:13-17). However, Defendant Budde also testified that he called Thompson back during his second drive-by. (Docket No. 67-8 at 133:11-12). Nonetheless, Defendant Budde's incident report does not mention Thompson calling him back after her initial 9:02 p.m. call to the police, (Pl. 56.1 Budde Resp. ¶ 205), and according to the phone log, there were only two outgoing calls to Thompson at 9:15 p.m. and 9:58 p.m., (Docket No. 67-20). Moreover, Thompson testified that she did not speak to Defendant Budde after the initial call except when he called her (or her cousin) to report that Plaintiffs had been released. (Docket No. 67-6 at 73:9-75:13). Defendant Budde also claims that Plaintiffs were seated in the cab of the truck on each of his drive-bys, the first of which he alleges occurred approximately seven minutes after speaking with Thompson. (Def. Budde 56.1 ¶¶ 36-38). However, Plaintiffs insist they were only inside the truck's cab for approximately five to fifteen minutes, and that they were not in the truck again after Plaintiff Lee spoke to the U-Haul representative at 8:23 p.m. (Pl. 56.1 Budde Resp. ¶¶ 37, 84-85, 87, 89).

Finally, Defendant Budde argues that "the totality of the circumstances," *Compton*, 830 F.3d at 61 (quoting *Bayless*, 201 F.3d at 133) – which included Plaintiffs ignoring his first two attempts to speak with them and repeated requests for identification – created reasonable suspicion for the *Terry* stop, (Docket No. 63 at 14; Def. Budde 56.1 ¶¶ 42-43). "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual

on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Florida v. Royer*, 460 U.S. 491, 497 (1983). "The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Id.* at 497-98 (citing *Terry*, 392 U.S. at 32-33 (Harlan, J., concurring)). A person's "refusal to listen or answer does not, without more, furnish [reasonable, objective grounds for detention]." *Id.* at 498.

Here, Plaintiffs dispute that Defendant Budde suspected them of any crimes when he approached them, since Defendant Budde testified that he called the Peekskill Police Department to report two "suspicious males," but did not say that he suspected them of any criminal offense. (Pl. 56.1 Peekskill Resp. ¶ 6; Docket No. 67-8 at 139:18-140:6). In addition, Defendant Budde's bodycam footage shows that Plaintiff Lee told him that Plaintiffs had been renting a U-Haul and that once their Uber arrived they would be "out of here," to which Defendant Budde responded "Alright." (Pl. 56.1 Budde Resp. ¶¶ 241-42). However, Defendant Budde contends that Plaintiffs leaving the scene "was another indication of [their] evasive behavior" which led to his reasonable suspicion. (Docket No. 63 at 15). Plaintiffs maintain that it is a question for a jury regarding whether walking to the Uber they called prior to Defendant Budde's arrival "constitutes an attempt to flee the encounter" that would give rise to reasonable suspicion to conduct a *Terry* stop. (Docket No. 68 at 22-23) (internal quotations omitted). Given the disputed facts relating to events surrounding what occurred, a jury must decide whether Defendant Budde had reasonable suspicion that Plaintiffs had committed a criminal offense meriting an investigatory stop. *See Compton*, 830 F.3d at 61.

Summary judgment is inappropriate "if determination of 'the issues involved will depend on the credibility of the witnesses.'" *Marks v. Nat'l Commc'ns. Ass'n*, 72 F. Supp. 2d 322, 333

(S.D.N.Y. 1999) (quoting 10A Wright et al., Federal Practice & Procedure § 2726, at 447 (1998)). "[T]o 'put credibility in issue so as to preclude summary judgment,' the nonmovant must produce 'specific facts' that demonstrate an actual inconsistency." *Id.* (quoting Wright et al., *supra,* § 2726, at 445). Here, the disputed facts relating to Defendant Budde's initial investigation, including how long he personally observed Plaintiffs, what he saw, and their first encounter, as well as inconsistencies regarding what Thompson relayed to Defendant Budde, create a material question as to whether Defendant Budde had reasonable suspicion based on specific and articulable facts to conduct a *Terry* stop.

Accordingly, the Court denies Defendant Budde's motion for summary judgment on Plaintiffs' claim of an unlawful investigatory stop.[10]

## 2. Whether the Investigatory Stop Ripened into an Arrest

Defendants further argue that the investigatory stop did not evolve into an arrest when Plaintiffs were handcuffed. Defendant Budde maintains that he was permitted to handcuff Plaintiffs because they did not cooperate, attempted to flee, and were not held any longer than necessary. (Docket No. 63 at 15-16). The Peekskill Defendants similarly argue that Plaintiffs were argumentative, attempted to leave the area, and were handcuffed for officer safety. (Docket No. 52 at 10-11). Plaintiffs maintain that Defendants are not entitled to summary judgment because there are material issues of fact as to whether Defendants believed Plaintiffs would flee and whether handcuffing Plaintiffs was truly because of concerns for officer safety. (Docket Nos. 57 at 19, 21-25; 68 at 23-27).

---

[10] Based on the relevant facts and pleadings, Plaintiffs' claims regarding an unlawful *Terry* stop appear to be brought against Defendant Budde only. Nonetheless, the Peekskill Defendants' summary judgment motion similarly argues that Defendant Budde's investigatory stop was supported by reasonable suspicion. To the extent Plaintiffs have plead a claim of unlawful investigatory stop against the Peekskill Defendants, the Court denies the Peekskill Defendants' motion for summary judgment for the same reasons as stated in Section III.A.1.

In determining whether a *Terry* stop is so intrusive as to ripen into an arrest, courts within the Second Circuit consider:

> the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.

*Grice*, 873 F.3d at 167 (quoting *United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993)). "A critical factor in evaluating the intrusiveness of a stop is the length of the detention." *United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992). However, "it is a highly context-sensitive" consideration, and "the Supreme Court has refused to adopt any rigid temporal limitation." *Farag v. United States*, 587 F. Supp. 2d 436, 456 (E.D.N.Y. 2008). "[W]here an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take 'necessary measures ... to neutralize the threat' without converting a reasonable stop into a *de facto* arrest." *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) (quoting *Terry*, 392 U.S. at 24).

While "[h]andcuffing is ordinarily not incident to a *Terry* stop ... a police officer 'faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists.'" *Grice*, 873 F.3d at 167 (quoting *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990)). The Second Circuit has held that "[i]n certain unusual circumstances ... handcuffing a suspect to investigate a reasonable suspicion does not transform a *Terry* stop into an arrest." *Id.* at 167-68 (collecting cases). Although using handcuffs is not ordinarily part of a *Terry* stop, "intrusive and aggressive police conduct is not an arrest when it is a reasonable response to legitimate safety concerns on the part of the investigating officers." *United States v.*

- 24 -

*Vargas*, 369 F.3d 98, 102 (2d Cir. 2004) (internal citation and quotation marks omitted).

Here, factual issues exist as to whether Plaintiffs' initial detention ripened into an arrest. *See United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 2005) ("At what point a permissible investigative detention ripens into an arrest is a question of fact."). When Plaintiffs were handcuffed, Defendant Budde was purportedly investigating whether they had committed or were committing the crimes of trespass, burglary, criminal mischief, and unauthorized use of a vehicle. (Docket No. 63 at 10). There are material factual disputes with respect to (1) whether Defendant Budde reasonably believed Plaintiffs were fleeing or would flee; and (2) whether Defendants' reason for handcuffing Plaintiffs was the officers' safety.

**i. Attempt to Flee**

It is reasonable to handcuff a defendant under a *Terry* stop, and does not turn the stop on its own into an arrest, when a defendant demonstrates an unwillingness to cooperate with an officer's investigation by fleeing. *Vargas*, 369 F.3d at 102. First, factual disputes preclude the Court from determining as a matter of law that it was reasonable for Defendant Budde to believe that Plaintiffs were attempting to flee the initial encounter with him. Defendant Budde asserts he informed Plaintiffs they were not free to leave when he initially approached them. (Def. Budde 56.1 ¶ 49). However, Plaintiff Lee claims Defendant Budde responded "Alright" when he repeatedly stated that they intended to leave once their Uber arrived. (Pl. 56.1 Budde Resp. ¶¶ 50, 240-42). Plaintiffs also contend that when they began walking away from Defendant Budde towards their Uber at 9:30 p.m., he said nothing to them and made no attempt to prevent them from leaving. (*Id.* ¶ 244; Def Budde. 56.1 ¶¶ 53). Whether Plaintiffs intended to flee the investigation by walking away from Defendant Budde is a question for the jury.

Second, there are material issues of fact regarding whether handcuffing Plaintiffs was

"sufficiently intrusive to ripen into a *de facto* arrest." *Vargas*, 369 F.3d at 101. Defendant Budde argues that the encounter was not an arrest because Plaintiffs were not held any longer than necessary. (Docket No. 63 at 16). The cases that Defendant Budde cites to support this argument are distinguishable. In *Fiseku*, three defendants were detained in handcuffs for about ten minutes after a police officer "stumbled upon a suspicious scenario in the middle of the night in a remote, wooded location." *United States v. Fiseku*, 915 F.3d 863, 873 (2d Cir. 2018). "The likelihood of ongoing or imminent criminal activity heightened the risk that one or more suspects might be armed and they might attempt to fight or flee." *Id.* Thus, "[u]nder these circumstances, handcuffing was a less intimidating—and less dangerous—means of ensuring [officer] safety ... than holding [the defendants] at gunpoint." *Id.* (internal quotations and citation omitted). In *Foreste*, a state trooper detained defendants for twenty-two minutes after pulling them over for speeding, as they were acting suspiciously[11] and gave her an expired rental agreement, which caused concern that the vehicle may have been stolen. *United States v. Foreste*, 780 F.3d 518, 520-21 (2d Cir. 2015). In addition, one of the defendants was a known drug dealer and used rental vehicles to transport his drugs. *Id.* at 521. The Court found that "independent grounds for suspicion of criminal activity justified the extension of [the] stop." *Id.* at 526. In *Goulbourne*, the court found that a twenty-minute investigatory stop was reasonable and did not turn the stop into a seizure because the police "developed reasonable suspicion of criminal activity – including that the car was stolen – in the first few minutes of the stop[.]" *United States v. Goulbourne*, 23-

---

[11] Specifically, one of the defendants "mumbled his response to [the trooper's] request for his license and registration; when she asked [him] to repeat himself, [the other defendant] answered; and, without being asked, [he] proceeded to explain the details of their trip to Vermont." *United States v. Foreste*, 780 F.3d 518, 520 (2d Cir. 2015).

CR-544 (VEC), 2024 WL 4025997, at *7 (Sept. 3, 2024).[12]  These cases are distinguishable from the instant matter because in each case officers cited specific and articulable facts giving rise to their reasonable suspicion that defendants were engaged in criminal activities, which "justified the extension of each stop." *Foreste*, 780 F.3d at 526.  In contrast, while Defendant Budde maintains that he suspected Plaintiffs of criminal trespass and tampering, (Peekskill Defs. 56.1 ¶¶ 5-6), Plaintiffs dispute he thought they had committed any crimes, as his testimony only refers to calling the Peekskill Police Department to report two "suspicious males," (Pl. 56.1 Peekskill Resp. ¶¶ 5-6).  Further, as discussed *supra* Section III.A.1, material issues of fact exist as to whether Defendant Budde had "independent grounds for suspicion of criminal activity" to justify extending his initial encounter with Plaintiffs. *Foreste*, 780 F.3d at 526.

"There is no 'hard-and-fast time limit' or '*per se* rule' for the permissible duration of an investigative stop." *Goulbourne*, 2024 WL 4025997, at *7 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).  "Instead, courts must assess the police officers' conduct during the stop and whether that conduct was reasonable to confirm or dispel their suspicion. ... Delays — ranging from minutes to hours long — are not unreasonable if they are caused by law enforcement officers taking necessary steps to confirm or dispel suspicion." *Id.*  As discussed, *supra* Section III.A.1, there are material issues of fact in dispute that led to Defendant Budde's alleged reasonable suspicion to investigate and detain Plaintiffs in the first instance.  Whether the length of Plaintiffs' detention – approximately ten to eleven minutes – was so intrusive as to ripen into an arrest turns on whether Defendant Budde had reasonable suspicion to investigate

---

[12] Specifically, the Court found that the officers developed reasonable suspicion because: "(1) the car was being driven at a very early hour – approximately 4:20 A.M.; (2) the occupants said they were coming from getting food to eat, despite the hour; (3) the car was purportedly rented; (4) the renter stated that he rented the car from his uncle but then later stated that he had rented the car from a friend; (5) the car was registered to an individual at a New Jersey address, not to a rental car company; and (6) the VIN was partially covered." *United States v. Goulbourne*, 23-CR-544 (VEC), 2024 WL 4025997, at *7 (Sept. 3, 2024).

Plaintiffs' purported criminal activity. This is a is a "highly context-sensitive" question for a jury to decide. *Farag*, 587 F. Supp. 2d at 456.

**ii. Use of Handcuffs**

There are also factual disputes as to whether it was reasonable for Defendants to believe Plaintiffs posed a threat to officer safety such that using handcuffs was justified and did not turn the *Terry* stop into an arrest. *See Grice*, 873 F.3d at 167.

The Court will first evaluate this claim with respect to Plaintiff Lee. When Defendant Larchevesque arrived about a minute after Plaintiffs walked away from Defendant Budde, he told Plaintiffs they were not free to leave. (Peekskill Defs. 56.1 ¶ 24). He then asked Plaintiff Lee to take his hands out of his pockets and place them on the rear of the car. (Pl. 56.1 Peekskill Resp. ¶¶ 27-28). Plaintiff Lee did not comply, so Defendant Larchevesque, with assistance from Defendant Long, handcuffed him. (*Id.* ¶¶ 29, 259). Defendant Larchevesque testified that Plaintiff Lee "tens[ed] his arms to squeeze the officer's hand against his body and refus[ed] to turn around," and was "argumentative and aggressive." (Peekskill Defs. 56.1 ¶¶ 37-38). A jury could find that this behavior created a "reasonable basis [for Defendant Larchevesque] to think that [Plaintiff Lee] pose[d] a present physical threat" to himself and the other officers. *Bailey*, 743 F.3d at 340. Thus, handcuffing him could be a "reasonable response to legitimate safety concerns" that did not convert the stop into a *de facto* arrest. *Vargas*, 369 F.3d at 102.

However, "even though handcuffs are generally recognized as a hallmark of a formal arrest, ... [t]he relevant inquiry is whether police have a reasonable basis to think that [Plaintiffs] ... pose[] a physical threat and that handcuffing is the least intrusive means to protect against that threat." *Bailey*, 743 F.3d at 340 (internal quotations and citations omitted). As discussed, *supra* Section III.A.1, a jury could also find that Defendants did not have grounds to handcuff Plaintiffs

because Defendants did not have reasonable suspicion to stop Plaintiffs in the first place.  Here, the "facts available to [Defendant Larchevesque] at the moment of the seizure" are in dispute. *Terry*, 392 U.S. at 21-22.  Defendant Larchevesque asserts that Plaintiffs were trying to leave against Defendant Budde's direction. (Peekskill Defs. 56.1 ¶ 14).  However, Plaintiffs contend that while Defendant Larchevesque understood two individuals were trying to leave the area, he was not aware of any specific instructions from Defendant Budde ordering Plaintiffs not to leave. (Pl. 56.1 Peekskill Resp. ¶ 14).  In fact, Defendant Larchevesque testified that he recalled Defendant Budde requesting backup over the radio, but could not remember if Defendant Budde said why he needed additional units; he also did not recall who provided additional information that Plaintiffs were attempting to leave the area. (Docket No. 67-10 at 15:14-16:10; 17:17-18:8). Defendant Larchevesque also testified that when he arrived on the scene, Defendant Budde approached the passenger side of his car and "was yelling that two male subjects were ... attempting to get into a car to flee the area." (*Id.* at 23:9-19).  However, Defendant Budde's bodycam footage records him as saying: "These two guys were inside the U-Haul.  I went to go stop them, they won't give me ID and now their Uber's right there." (Pl. 56.1 Peekskill Resp. ¶ 16).  Further, Defendant Budde testified that he did not recall if he told Defendant Larchevesque that Plaintiffs did not have a legal right to be in the U-Haul, nor did he recall speaking to him at all at this point in his investigation. (Docket No. 67-8 at 151:8-15).

Moreover, when Defendant Larchevesque approached Plaintiffs at their Uber, he advised them they were not free to leave "because Officer Budde was conducting his investigation." (Docket No. 67-10 at 23:24-24:14; 25:18-26:7).  When Plaintiff Lee asked Defendant Larchevesque why he was being detained, he responded that Defendant Budde "told you to stop and asked for your ID and you said 'no.'" (Docket No. 57 at 23; Pl. 56.1 Budde Resp. ¶ 255).

These factual disputes call into question what Defendant Larchevesque knew prior to stopping Plaintiffs, including whether he reasonably believed they were attempting to flee the area or if he had any information that either Plaintiff posed a threat to the officers.  Thus, a jury could find that it was not reasonable for the Peekskill Defendants to conclude that handcuffing Plaintiffs was the least intrusive means to protect them against the "possibility of danger" from Plaintiff Lee. *Grice*, 873 F.3d at 167; *see also Bailey*, 743 F.3d at 340.  As a result, there is a factual question regarding whether using handcuffs on Plaintiff Lee ripened the *Terry* stop into an arrest.

Further, factual disputes also exist regarding whether it was reasonable for the Peekskill Defendants to believe that Plaintiff Garrett posed a threat to officer safety which justified handcuffing him.  Plaintiff Garrett immediately complied with Defendant Budde's instructions to place his hands on the rear of the Uber and did not resist when Defendants Budde and Long handcuffed him. (Pl. 56.1 Budde Resp. ¶¶ 256, 258-60).  Defendant Budde also conducted a pat down while handcuffing Plaintiff Garrett because he observed something heavy causing his sweatshirt to hang down, but upon running his hand along the outside of the sweatshirt he determined that the item was not a weapon. (Pl. 56.1 Budde Resp. ¶¶ 261-63).  A reasonable jury could find that handcuffing Plaintiff Garrett under these circumstances was not the "least intrusive means to protect against [a] threat," *Bailey*, 743 F.3d at 340, and therefore exceeded the scope of a *Terry* stop because Plaintiff Garrett was compliant and unarmed. *See Sherman v. Holt*, No. 6:12-CV-292 (ATB), 2013 WL 6506475, at *5 (N.D.N.Y. Dec. 12, 2013) (handcuffing exceeded the scope of a permissible *Terry* stop where plaintiff demonstrated that she was compliant and possessed no weapon).  In *Bailey*, the court concluded that "police exceeded the permissible scope of a *Terry* stop when they handcuffed Bailey after a patdown showed that

neither he nor his companion [] was armed." *Bailey*, 743 F.3d at 332.[13]  The facts here are

analogous.[14]  Thus, there is a material issue of fact as to whether handcuffing Plaintiff Garrett

ripened his initial detention into an arrest.

Finally, there was significant police presence that belies Defendants' arguments that this

simply was a *Terry* stop.  Two other officers and a police canine arrived at the location by 9:32

p.m. and remained at the scene for the entirety of the time that Plaintiffs were handcuffed. (Pl.

56.1 Budde Resp. ¶¶ 308-313, 318).  Also at the scene, and visible to Plaintiffs, were three

marked and one unmarked Peekskill Police Department vehicles with emergency lights

activated. (*Id.* ¶ 313).  This police presence raises questions as to whether the *Terry* stop ripened

into an arrest. *See Warren v. Ewanciw*, 15 Civ. 8423 (JCM), 2019 WL 589488, at *7-*8

(S.D.N.Y. Feb. 13, 2019) (finding factual issues remained as to whether Plaintiff's detention

ripened into an arrest after he was handcuffed because the officers who responded greatly

outnumbered Plaintiff); *Kennedy v. City of N.Y.*, No. 07 CIV. 10622 (NRB), 2010 WL 1779235,

at *6 (S.D.N.Y. Apr. 26, 2010) (finding that plaintiff's detention turned into a *de facto* arrest in

part because the officers outnumbered the plaintiff).  Here, Plaintiffs were handcuffed and their

freedom of movement was restrained for approximately ten minutes, with five officers on the

scene, four police cars with their emergency lights activated, and no officer suspected Plaintiffs

were armed. *See Grice*, 873 F.3d at 167.  As a result, a reasonable jury could conclude that the

*Terry* stop was "so intrusive as to become an arrest." *Id.*

"Given the disputed issues of fact that are material as to whether [Defendants] exceeded

---

[13] *See also United States v. Fiseku*, 915 F.3d 863, 872 (2d Cir. 2018) (noting that the court found a Fourth Amendment violation in *Bailey* because "the record evinced no 'physical threat' or other factor that would justify handcuffing the two men.") (quoting *Bailey*, 743 F.3d at 340).

[14] When Plaintiff Garrett was handcuffed, the Peekskill Defendants had already conducted a patdown of Plaintiff Lee and found no weapons. (Peekskill Defs. 56.1 ¶ 31).

the scope of a permissible *Terry* stop by handcuffing and detaining [Plaintiffs], the [C]ourt cannot grant summary judgment in favor of [Defendants] on this issue." *Sherman*, 2013 WL 6506475, at *5; *see also Lee v. City of N.Y.*, No. 00-CV-3181 (JG), 2002 WL 1732810, at *6 (E.D.N.Y. July 22, 2002) ("Because the parties present conflicting accounts of the detention, the issue of whether [plaintiff] was subjected to an arrest must go to the jury"). Accordingly, the Court finds that factual issues remain as to whether Plaintiffs' detention transformed the investigatory stop into a *de facto* arrest.

### 3. False Arrest and Imprisonment

Assuming, *arguendo*, that the investigatory stop ripened into an arrest, there are genuine disputes of material fact as to whether there was probable cause to arrest Plaintiffs, precluding granting summary judgment on Plaintiffs' false arrest claim.

Unlike a *Terry* stop, arrests require probable cause. *Grice*, 873 F.3d at 167. "Probable cause to arrest exists 'when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 610 (S.D.N.Y. 2013) (quoting *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995)); *see also Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *Henry v. United States*, 361 U.S. 98, 102 (1959) ("Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed."). "Whether or not an officer had probable cause to make an arrest is a question of what the officer knew at the time of the arrest and whether she or he was reasonable in relying on that knowledge." *Coyle v. Coyle*, 354 F. Supp. 2d 207, 211 (E.D.N.Y. 2005) (internal quotation marks and citation omitted), *aff'd*, 153 F. App'x 10 (2d Cir. 2005); *see also Kayo v. Mertz*, 531 F. Supp. 3d 774, 789 (S.D.N.Y.

2021) ("When determining whether probable cause exists[,] courts must consider those facts available to the officer at the time of the arrest and immediately before it.") (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). "[P]robable cause exists even where it is based upon mistaken information, so long as the arresting officer was reasonable in relying on that information." *Aberra v. City of N.Y.*, No. 21-1992, 2023 WL 221096, at *1 (2d Cir. Jan. 18, 2023) (summary order) (quoting *Bernard v. United States*, 25 F.3d 98, 103 (2d Cir. 1994)). "The question of whether or not probable cause exist[s] may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant*, 101 F.3d at 852.

In the Second Circuit, courts analyzing Section 1983 claims for false arrest have "generally looked to the law of the state in which the arrest occurred." *Weilburg v. Koss*, No. 24-2234-cv, 2025 WL 1157080, at *1 (2d Cir. Apr. 21, 2025) (summary order) (quoting *Jaegly v. Couch*, 439 F.3d 149, 151-52 (2d Cir. 2006)). "To establish a false arrest claim [under New York law], a plaintiff must show that: (1) the defendant intentionally confined the plaintiff; (2) the plaintiff was aware of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *Smith v. City of N.Y.*, 388 F. Supp. 2d 179, 184 (S.D.N.Y. 2005). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013).

### i. Defendant Budde's Asserted Probable Cause

Defendant Budde argues that he had probable cause to "believe that Plaintiffs did not have permission to be in the vehicle and could be arrested for trespass, and unauthorized use of a vehicle." (Docket No. 63 at 17). He asserts probable cause existed because of: "(1) Thompson's

eyewitness account[;] (2) his own personal observations of Plaintiffs' conduct"; (3) "Plaintiff[s']

refusal to cooperate and attempt to flee"; (4) "Plaintiffs' failure to claim they had a rental

agreement to rent the truck[;]" and (5) Plaintiffs leaving by foot instead of driving the U-Haul,

which demonstrated "they did not have permission to use or enter the vehicle." (*Id.* at 17-18).

Plaintiffs argue that because Defendant Budde did not have reasonable suspicion to initially stop

them, "it necessarily follows that Plaintiffs' ensuing detention was not supported by probable

cause." (Docket No. 68 at 27).

        As discussed, *supra* Section III.A.1, the information known to Defendant Budde before

he arrested Plaintiffs is in dispute.  Namely, there are critical factual questions regarding

Thompson's testimony and Defendant Budde's own observations. *See supra* Section III.A.1.

The same disputes of material fact that preclude summary judgment on Plaintiffs' claim that they

were unlawfully detained also preclude summary judgment on Plaintiffs' false arrest claim

because the record is not clear regarding whether Defendant Budde had probable cause.

        Defendant Budde maintains that there is "clear precedent in this Circuit that an officer

has probable cause to arrest based on an individual's failure to produce a valid rental agreement

when questioned about the rental vehicle." (Docket No. 63 at 18-19).  However, the cases he

cites are distinguishable.  Here, there is a factual dispute regarding what Defendant Budde said to

Plaintiffs when he first detained them, including whether he told them "they were stopped in

response to a call that they were seen inside a U-Haul after business hours." (Pl. 56.1 Budde

Resp. ¶ 44).  There are also factual disputes regarding whether Defendant Budde asked Plaintiffs

about a rental agreement or contract, if Plaintiffs showed or attempted to show him an

agreement, and if Defendant Budde ever saw an agreement.  Plaintiffs argue that Defendant

Budde never inquired about the rental agreement. (Docket No. 57 at 20).  Defendant Budde

asserts Plaintiff Lee told him he had a reservation "but refused to show it to him." (Pl. 56.1 Budde Resp. ¶ 48). Defendant Budde's bodycam footage shows that when he first encountered Plaintiffs, Plaintiff Lee stated "If I told you I had a reservation right now, what would you say?", (*id.*), and Defendant Budde said "let me see," (Docket No. 67-16 at 4:03-4:06). Yet, Defendant Budde also testified at his deposition that he did not attempt to determine whether Plaintiffs had a reservation for the U-Haul truck while they were in custody, because he and Mr. Saleh could not consult the online reservation system due to an internet outage. (Docket No. 67-8 at 157:4-158:1).

Moreover, Defendant Budde admitted that Plaintiff Lee "showed something on his phone up against [his] body cam," but that he could not view it while Plaintiffs were detained. (*Id.* at 158:2-13). Instead, Defendant Budde said that he was only able to view what Plaintiff Lee showed him when reviewing his body cam footage after the incident, but that he "couldn't make ... out" what it was. (*Id.* at 158:14-160:19). In addition, Defendant Budde admitted that his writeup of the incident did not include any reference to Plaintiff Lee showing him what he claimed was a U-Haul reservation. (*Id.* at 160:20-161:5). However, Plaintiff Lee can be heard on Defendant Long's bodycam footage, as he was being handcuffed, saying "Let me show – can I show you my reservation?" (Docket No. 67-17 at 0:40-0:45). It is clear from Defendant Budde's bodycam footage that a reasonable jury could find that Plaintiffs never had an opportunity to show the officers proof of the reservation, because Defendants handcuffed them immediately. (Docket No. 67-16 at 10:22-11:15). Thus, factual questions remain as to whether Plaintiffs failed to say that they had a rental agreement, whether they failed to produce an agreement, or whether Defendant Budde ever saw an agreement himself, all of which Defendant Budde said established probable cause that they had committed a crime. (Docket No. 63 at 18).

Accordingly, Defendant Budde is not entitled to summary judgment on Plaintiffs' false arrest claims because material issues of fact exist as to whether Defendant Budde had probable cause to arrest Plaintiffs.

**ii. Peekskill Defendants' Asserted Probable Cause**

The Peekskill Defendants argue they had probable cause to detain Plaintiffs "based upon what they knew at the time of their arrival, including: (1) a call for assistance from a distressed police officer; (2) Officer Budde's communication that the suspects were attempting to leave the scene of a suspected criminal trespass; [and] (3) consistent argumentative and uncooperative behavior on the part of the suspects." (Docket No. 52 at 13).  Plaintiffs assert that the Peekskill Defendants detained Plaintiffs without probable cause.  Specifically, Plaintiffs argue that "the facts collectively available to [the Peekskill] Defendants did not approach even 'a strong suspicion' that Plaintiffs had committed a crime." (Docket No. 57 at 26) (citing *Henry*, 361 U.S. at 101).

Here, the Court finds that there are material issues of fact regarding whether the Peekskill Defendants had "knowledge or reasonably trustworthy information" to support their belief that Plaintiffs had committed a crime. *Cooper*, 925 F. Supp. 2d at 610 (internal quotations omitted). As discussed, *supra* Section III.A.1, the information known to Defendant Budde before he stopped Plaintiffs is in dispute.  In addition, factual disputes also exist regarding what information Defendant Budde conveyed to the Peekskill Defendants.  The Peekskill Defendants assert that Defendant Budde was in distress when he called for assistance[15] and that he communicated to them that Plaintiffs were "attempting to leave the scene of a suspected criminal trespass." (Docket No. 52 at 13).  However, Plaintiffs dispute that Defendant Budde suspected

---

[15] Specifically, Defendant Larchevesque maintains that he "detected distress" in Defendant Budde's voice when he called the Peekskill Police Department for assistance. (Docket No. 52 at 6).

them of any crimes or that he reported his suspicion over the radio, as his testimony only refers to calling the Peekskill Police Department to report two "suspicious males" without indicating that he believed they had committed any criminal offense. (Pl. 56.1 Peekskill Resp. ¶ 6; Docket No. 67-8 at 139:18-140:6).

The parties also disagree on what Defendant Budde told Defendant Larchevesque when they first met. *See supra* Section III.A.1.iii. Defendant Larchevesque maintains Defendant Budde said that "the two males were attempting to get into a car and flee the area." (Peekskill Defs. 56.1 ¶ 16). Defendant Budde's bodycam footage records him as saying: "These two guys were inside the U-Haul. I went to go stop them, they won't give me ID and now their Uber's right there." (Pl. 56.1 Peekskill Resp. ¶ 16). Viewing the record in the light most favorable to Plaintiffs, whether Defendant Budde communicated to the Peekskill Defendants that two "suspects were attempting to leave the scene of a suspected criminal trespass" is in dispute. (Docket No. 52 at 13). Considering the facts "available to the [Peekskill Defendants] at the time of the arrest and immediately before it," the Court cannot determine as a matter of law that probable cause existed for the Peekskill Defendants to believe Plaintiffs had committed a crime. *Kayo*, 531 F. Supp. 3d at 789 (quoting *Panetta*, 460 F.3d at 395).

The Peekskill Defendants also argue that Plaintiffs' "consistent argumentative and uncooperative behavior," as well as the fact that Plaintiffs "did not produce any documentation of a U-Haul reservation until the investigation was completed," established probable cause to detain Plaintiffs. (Docket No. 52 at 13-14). Again, these facts are in dispute. As discussed, *supra* Section III.A.1.iii, while Plaintiff Lee did not comply with the Peekskill Defendants' commands in the first instance, (Pl. 56.1 Peekskill Resp. ¶¶ 27-28), Plaintiff Garrett immediately followed all instructions and did not resist, (Pl. 56.1 Budde Resp. ¶¶ 258-60). Further, while

Plaintiff Lee was being handcuffed, he told Defendants that he had a U-Haul reservation (Defendant Budde's and Defendant Long's bodycam video records Plaintiff Lee saying "Can I show you my reservation?") and that he intended to sue the responding police officers. (*Id.* ¶ 314; Docket Nos. 67-16 at 10:25-10:30; 67-17 at 0:40-0:45). Defendant Long also testified that while she did not recall hearing Plaintiff Lee offer to show his reservation as events were unfolding, his offer to do so would "not really" have impacted her "assessment of what was going on at the time" because "this was [Defendant] Budde's investigation." (Docket No. 67-9 at 65:21-67:9). This contradicts the Peekskill Defendants' assertion that Plaintiffs' failure to produce documentation relating to their U-Haul reservation gave rise to their belief that Plaintiffs had committed a crime. (Docket No. 52 at 13-14). Given the factual disputes as to Plaintiffs' behavior and what information Defendants had regarding Plaintiffs' U-Haul reservation, *see supra* Section III.A.2.i, the Court cannot determine as a matter of law that the Peekskill Defendants had probable cause to arrest Plaintiffs.

### iii. Probable Cause Conclusion

Considering there are material issues of fact regarding whether probable cause existed to believe Plaintiffs had committed or were committing a crime, the Court cannot grant summary judgment on Plaintiffs' false arrest claim. *See Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 245 (2d Cir. 2020) ("It is a bedrock rule of civil procedure that a district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented.") (internal quotations omitted); *see also D'Olimpio v. Crisafi*, 718 F. Supp. 2d 357, 368 (S.D.N.Y. 2010) ("[W]hile a fact-finder could ultimately conclude from the record here that the officers had probable cause to arrest [Plaintiffs], that conclusion would require the weighing of evidence and assessments of credibility, which go beyond the sorts of determinations that the Court may make

in ruling on motions for summary judgment."); *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (affirming the District Court's granting of summary judgment because "no rational finder of fact could find in favor of the nonmoving party") (internal quotations and citation omitted). Here, the facts "available to the officer[s] at the time of the arrest and immediately before it" are in dispute. *Kayo*, 531 F. Supp. 3d at 789 (quoting *Panetta*, 460 F.3d at 395). A reasonable jury could find that Defendant Budde did not have probable cause to make an arrest because he did not have "knowledge or reasonably trustworthy information" that caused him to believe Plaintiffs had committed a crime. *Weyant*, 101 F.3d at 852. Similarly, a reasonable jury could find that the Peekskill Defendants lacked probable cause to make an arrest because it was not reasonable to rely on "what [they] knew at the time of the arrest." *Coyle*, 354 F. Supp. 2d at 211. However, it is also true that a jury could conclude Defendant Budde had probable cause to reasonably believe a crime had been committed based on his investigation, and the Peekskill Defendants also had probable cause based on the information conveyed to them by Defendant Budde. *Id.*; *see also Henry*, 361 U.S. at 102.

Finally, since false imprisonment shares the same elements as false arrest under New York law, the Court denies Defendant Budde and the Peekskill Defendants summary judgment on Plaintiffs' false imprisonment claim for the same reasons. *See Minott v. City of N.Y.*, 11 Civ. 1217 (PGG), 2012 WL 13388815, at *4 n.3 (S.D.N.Y. Sept. 7, 2012) ("To the extent that Plaintiff alleges both false arrest and false imprisonment, they are considered synonymous causes of action."); *see also Shaheed v. City of N.Y.*, 287 F. Supp. 3d 438, 448 (S.D.N.Y. 2018) (describing false arrest as a "species of false imprisonment, such that the two share the same elements under New York law.") (internal quotations omitted).

### 4. Unreasonable and Unlawful Search

The Fourth Amendment guarantees a right to be free from unreasonable searches.  "When conducting a lawful arrest, officers may search the arrestee's person and area within his immediate control without a warrant." *United States v. Brito*, 771 F. Supp. 3d 157, 167-68 (E.D.N.Y. 2025) (internal quotations and citation omitted); *see also United States v. Morillo*, No. 08 CR 676 (NGG), 2009 WL 3254431, at *3 (E.D.N.Y. Oct. 9, 2009) ("A search incident to arrest is a well-settled exception to the Fourth Amendment's warrant requirement.").  There are two justifications for the search incident to arrest doctrine: "protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." *Brito*, 771 F. Supp. 3d at 172 (quoting *United States v. Diaz*, 854 F.3d 197, 205 (2d Cir. 2017)). "A search incident to arrest may be lawful 'regardless of whether or not the officer intended to [make an arrest] prior to the search.'" *United States v. Dupree*, 767 F. App'x 181, 183 (2d Cir. 2019) (quoting *Diaz*, 854 F.3d at 207).

In addition, once an officer has lawfully stopped someone based on reasonable suspicion of criminal activity, the *Terry* standard "permit[s] a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry*, 392 U.S. at 27.  "To support an accompanying pat-down frisk after a *Terry* stop, there must be a reasonable basis to think that 'the person stopped is armed and dangerous.'" *United States v. Pankey*, 1:24-cr-122 (MKV), 2024 WL 3522138, at *5 (S.D.N.Y. July 23, 2024) (quoting *Arizona v. Johnson*, 555 U.S. 323, 326 (2009)); *see also United States v. Weaver*, 9 F. 4th 129, 139 (2d Cir. 2021) ("A police officer must have a reasonable suspicion not only that criminal activity is afoot, but also that the person suspected is armed and dangerous.")

(internal quotations removed).  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.  The reasonable suspicion standard "requires that a police officer 'be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion' [on the citizen's liberty interest]." *Weaver*, 9 F. 4th at 141 (quoting *Terry*, 392 U.S. at 21).

If officers suspect an individual is armed and dangerous, they may conduct a "carefully limited" search, *Terry*, 392 U.S. at 30, of the "arrestee's person and the area within his immediate control—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence," *Michigan v. Long*, 463 U.S. 1032, 1048 (1983) (internal quotations omitted).  "If the frisk gives rise to reasonable suspicion that an object in the clothing of the stopped person is a weapon that could be used to harm the officer, then the officer may take whatever action is necessary to examine the object and protect himself—including removing the object from the clothing of the stopped person." *Floyd v. City of N.Y.*, 959 F. Supp. 2d 540, 569 (S.D.N.Y. 2013).  "It is well established that a bulge consistent with the shape of a firearm, and located somewhere a firearm would likely be found, supports reasonable suspicion" for a search incident to a *Terry* stop. *United States v. Hagood*, 78 F. 4th 570, 577 (2d Cir. 2023).[16]  "However, the outline of a commonly carried object such as a wallet or cell phone does not justify a stop or frisk, nor does feeling such an object during a frisk justify a search." *Floyd*,

---

[16] *See also Pennsylvania v. Mimms*, 434 U.S. 106, 107, 112 (1977) (finding officer's frisk justified after he noticed "a large bulge under respondent's sports jacket" that he feared might be a weapon); *United States v. Padilla*, 548 F.3d 179, 189 (2d Cir. 2008) (finding it reasonable for officer to infer that defendant was carrying a gun in his waistband after observing him "reach underneath his jacket and shirt and adjust a weighty object concealed at the center of his waistline," a gesture "consistent with the adjustment of a concealed firearm").

959 F. Supp. 2d at 614.  Any "continued exploration" of a suspect after concluding he is not armed is unlawful. *Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993).

In the complaint, Plaintiffs argue that Defendants "violated [their] rights to be free from unreasonable searches and seizures." (Docket No. 1 at 7).  Construing the pleadings in the light most favorable to Plaintiffs, they appear to allege three unlawful searches: (1) Defendant Budde's search of Plaintiff Lee's wallet, (Docket No. 68 at 27-28); (2) Defendant Budde's and Defendant Long's searches of Plaintiff Garrett's pocket, (*Id.* at 28-29; Docket No. 57 at 20-21); and (3) Defendant Long's search of Plaintiff Lee's backpack, (Docket No. 57 at 30-33).  Defendant Budde claims that searching "[Plaintiff] Lee's wallet following the [initial] stop was permitted under both reasonable suspicion and probable cause." (Docket No. 63 at 20).  Defendant Budde further argues that "[t]he pat-down of Plaintiff Garret[t] subsequent to his handcuffing was permissible under an investigatory stop or following an arrest pursuant to probable cause" because he "reasonably believed Garret[t] might have been armed." (*Id.*).  The Peekskill Defendants similarly assert that, based on their "professional judgment and training," they had concerns and reasonable suspicion that Plaintiffs were "armed and dangerous," which required searching Plaintiff Garrett's pocket and Plaintiff Lee's backpack. (Docket No. 52 at 9-10).

Since it is clearly in dispute whether Defendants had reasonable suspicion for a *Terry* stop, or probable cause to arrest Plaintiffs, *see supra* Sections III.A.1 and 2, questions of fact remain as to whether the ensuing searches were reasonable.  Moreover, material questions of fact remain as to whether it was reasonable for Defendants to believe Plaintiffs posed a threat to officer safety. *See supra* Section III.A.1.iii.  To evaluate if Defendants "had a reasonable basis to think that [Plaintiffs] were armed and dangerous," *Pankey*, 2024 WL 3522138, at *5, the issue of

- 42 -

whether there was reasonable suspicion for the stop or probable cause for the arrest must first be resolved.  Plaintiffs must have been "lawfully stopped based on [Defendants'] reasonable suspicion of criminal activity" to "permit a reasonable search for weapons." *Terry*, 392 U.S. at 27.  Given the genuine dispute of material fact regarding whether Defendants had reasonable suspicion or probable cause, the Court cannot determine as a matter of law that the searches incident to the stop or arrest were reasonable, and, therefore declines to grant summary judgment on Plaintiffs' unlawful search claim.

## B.  Qualified Immunity

Defendant Budde argues that he is entitled to qualified immunity because he demonstrated "arguable probable cause," (Docket No. 63 at 20-21), and the Peekskill Defendants assert they are entitled to qualified immunity under the collective knowledge doctrine, (Docket No. 52 at 14-17).  Plaintiffs contend that qualified immunity is not appropriate for Defendant Budde because credibility issues "present material fact questions not only as to his version of relevant events, but the integrity of his entire investigation," thus the objective reasonableness of his actions is in dispute. (Docket No. 68 at 29-30).  Plaintiffs further maintain that the Peekskill Defendants are not entitled to qualified immunity because (1) the existence of reasonable suspicion and probable cause "depends entirely on [Defendant] Budde's credibility," thus, the Court cannot summarily determine if their reliance on his knowledge was objectively reasonable; and (2) "a reasonable jury could conclude that the Peekskill Defendants are not entitled to the benefit of the collective knowledge doctrine based on the absence of a directive from [Defendant] Budde (the officer with putative knowledge) to stop or detain Plaintiffs." (Docket No. 57 at 27-28).  The Court will address qualified immunity with respect to Defendant Budde and the Peekskill Defendants in turn.

### i. Defendant Budde

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Officials are "entitled to qualified immunity [when] their decision was reasonable, even if mistaken." *Hunter v. Bryant*, 502 U.S. 224, 228-29 (1991). Indeed, "the qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 229 (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)). To analyze a qualified immunity defense on summary judgment, courts ask "(1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).

Where probable cause is absent, "an arresting officer is still entitled to qualified immunity if he can establish that there was 'arguable probable cause.'" *Wheeler v. Kolek*, 16-cv-7441 (PMH), 2020 WL 6726947, at *7 (S.D.N.Y. Nov. 16, 2020) (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera*, 361 F.3d at 743 (internal quotations omitted). "[U]nder this standard, an arresting officer is entitled to qualified immunity as a matter of law if the *undisputed facts* and all permissible inferences favorable to the plaintiff show ... that officers of reasonable competence could disagree on whether the probable cause test was met." *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 39 (E.D.N.Y. 2015) (emphasis in original) (internal quotations omitted); *see also Boyd v. City of N.Y.*, 336 F.3d

72, 76 (2d Cir. 2003) ("Probable cause does not require absolute certainty.  Moreover, if police officers of reasonable competence could disagree as to whether there was sufficient probable cause, there is 'arguable' probable cause sufficient to warrant qualified immunity for the defendant officers.").  The Second Circuit has held that an officer is protected by qualified immunity, and summary judgment on a false arrest claim is appropriate, if "a rational jury could *not* find that the officers' judgment was so flawed that no reasonable officer would have made a similar choice." *Rine v. Giardina*, 199 F.3d 1323 (2d Cir. 1999) (quoting *Lennon v. Miller*, 66 F.3d 416, 424-25 (2d Cir. 1995)) (emphasis in original). "Thus, even if an officer is mistaken, and the arrestee did not commit the crime, the officer will not be held liable if he acted reasonably and in good faith." *Washpon v. Parr*, 561 F. Supp 2d. 394, 403 (S.D.N.Y. 2008) (citing *Bernard*, 25 F.3d at 102).

Here, there are genuine issues of material fact regarding the circumstances surrounding Defendant Budde's decision to detain Plaintiffs, or whether he had probable cause to arrest them, which precludes the Court from finding Defendant Budde's conduct objectively reasonable as a matter of law. *See supra* Section III.A; *Bacote v. Riverbay Corp.*, 1:16-cv-1599 (GHW), 2017 WL 11567934, at *12 (S.D.N.Y. Nov. 8, 2017) ("Because summary judgment on qualified immunity grounds is inappropriate where there are disputed issues of fact pertinent to a determination of the reasonableness of an officer's conduct, Defendants' motion for summary judgment on this basis is denied."); *see also Nazario v. Thibeault*, No. 22-01657, 2023 WL 7147386, at *2 (2d Cir. Oct. 31, 2023) (summary order) (open material issues of fact preclude finding of qualified immunity); *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.").

Under the circumstances presented here, a reasonable jury could find that Defendant Budde's investigation – based on Thompson's testimony and his own observations – did not give rise to reasonable suspicion or probable cause that Plaintiffs had committed or were committing a crime. Defendant Budde's assertion that reasonable suspicion or probable cause existed is not based on "undisputed facts" which show "that officers of reasonable competence could disagree on whether the probable cause test was met." *Weiner*, 90 F. Supp. 3d at 39. "Because, as explained *supra*, the circumstances leading up to the seizure are disputed and hinge on credibility determinations, which can only be made at trial, [Plaintiffs' claims] survive[] summary judgment." *Williams v. Hughes*, 20-CV-10571 (PMH), 2024 WL 5239048, at *7 (S.D.N.Y. Dec. 27, 2024).

Accordingly, the Court finds that Defendant Budde is not entitled to qualified immunity on Plaintiffs' unlawful investigatory stop, false arrest, false imprisonment, and unlawful search claims.

**ii. Peekskill Defendants**

The Court turns to whether the Peekskill Defendants should be granted qualified immunity under the "arguable probable cause" standard. There are genuine issues of material fact regarding whether the Peekskill Defendants had reasonable suspicion to detain Plaintiffs, or probable cause to arrest them, which precludes the Court from finding the Peekskill Defendants' conduct objectively reasonable as a matter of law. *See Bacote*, 2017 WL 11567934, at *12; *supra* Section III.A. For example, the parties disagree on what information Defendant Budde conveyed to the Peekskill Defendants about his investigation, what he told Defendant Larchevesque when they first met, and how Plaintiffs behaved when stopped by the police. *See supra* Section III.A. This raises questions as to whether the Peekskill Defendants "had knowledge or reasonably

trustworthy information" to support their belief that Plaintiffs had committed a crime. *Cooper*, 925 F. Supp. 2d at 610. Thus, a rational jury could find that the Peekskill Defendants' assertion that reasonable suspicion or probable cause existed to detain or arrest Plaintiffs "was so flawed that no reasonable officer[s] would have made a similar choice." *Rine*, 199 F.3d at 1323. Moreover, the material factual disputes preclude a finding of qualified immunity. *See Nazario*, 2023 WL 7147386, at *2; *see also Thomas*, 165 F.3d at 143 ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness."). Accordingly, the Court cannot grant the Peekskill Defendants qualified immunity on Plaintiffs' Fourth Amendment claims pursuant to the "arguable probable cause" standard.

However, the Peekskill Defendants also assert they are entitled to qualified immunity pursuant to the collective knowledge doctrine. Under this doctrine, the knowledge of one officer supporting a search or seizure may be imputed to other law enforcement officers acting in conjunction with the knowledgeable officer. *See United States v. Hensley,* 469 U.S. 221, 232-33 (1985). "When evaluating whether officers had probable cause or a reasonable suspicion, the analysis must take into account not just the personal knowledge of the officers making the stop, but also the collective knowledge of other members of law enforcement with whom the arresting officers were in contact." *United States v. Tartaglione*, No. 16-CR-832 (KMK), 2023 WL 2237903, at *13 (S.D.N.Y. Feb. 27, 2023); *see also United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) ("[An] arresting officer might not be aware of all the underlying facts that provided probable cause or reasonable suspicion, but may nonetheless act reasonably in relying on information received by other law enforcement officials."); *Borges v. City of N.Y.*, 621 F. Supp. 3d 362, 371 (E.D.N.Y. 2022) ("The collective knowledge doctrine provides that, for the

purpose of determining whether an arresting officer has probable cause to arrest, where law enforcement authorities are cooperating in an investigation, the knowledge of one is presumed shared by all.") (internal quotation and citation omitted).

"Even when unaware of all relevant information, the arresting officers may have probable cause or a reasonable suspicion when they were relying on instructions from officers who 'had information that would provide reasonable suspicion or probable cause to search or arrest the suspect.'" *Tartaglione*, 2023 WL 2237903, at *13 (quoting *United States v. Colon*, 250 F.3d at 135-36); *see also United States v. Babilonia*, 854 F.3d 163, 178 (2d Cir. 2017) ("[E]ven if the law enforcement officer actually conducting the search lacks the relevant facts to support probable cause, the search may nonetheless be permissible if the officer acted on the assessment or instructions of other officers who did have such facts."). "In addition, in order to be insulated from liability by the collective knowledge doctrine, the arresting officer must have acted reasonably in relying on the information communicated to him." *Colon v. City of N.Y.*, No. 11-CV-0173 (MKB), 2014 WL 1338730, at *5 (E.D.N.Y. Apr. 2, 2014); *see also Husbands ex rel. Forde v. City of N.Y.*, 335 F. App'x 124, 128 (2d Cir. 2009) ("[W]hether probable cause exists does not depend on the accuracy of the fellow officer's observations, but rather whether it was reasonable for the arresting officer to rely on them."); *Golphin v. City of N.Y.*, No. 09 Civ. 1015 (BSJ), 2011 WL 4375679, at *2 (S.D.N.Y. Sept. 19, 2011) ("When the collective knowledge doctrine applies, the proper inquiry is whether the arresting officer acted reasonably, as opposed to whether probable cause actually existed or the vouching officer acted reasonably.").

Here, a jury could find that when the Peekskill Defendants detained Plaintiffs, they were "not aware of the facts" supporting reasonable suspicion for the investigatory stop or probable cause for the arrest. *Colon*, 2014 WL 1338730, at *7. Moreover, a reasonable jury could find

that the Peekskill Defendants "had not been told that [Defendant Budde] had determined that [reasonable suspicion to detain or] probable cause to arrest existed." *Id.* There remain factual disputes as to what Defendant Budde relayed to the Peekskill Defendants when he made his radio calls for assistance, as well as to whether he conveyed to the other officers that he suspected Plaintiffs had committed a crime. *See supra* Sections I.A.3, III.A. Given the factual disputes regarding the officers' communications that allegedly established reasonable suspicion or probable cause, it remains a question for a jury whether it was reasonable for the Peekskill Defendants to rely on such information to detain, search, or arrest Plaintiffs. *See Husbands*, 335 F. App'x at 128; *Golphin*, 2011 WL 4375679, at *3. Depending on what Defendant Budde communicated to the Peekskill Defendants, "a jury could ... find that [they] did not reasonably rely on any communications from [their] fellow officer[] when participating in the [detention or] arrest of Plaintiffs." *Colon*, 2014 WL 1338730, at *7. Thus, "[t]he Court cannot find as a matter of law that [the Peekskill Defendants are] insulated from liability based on the collective knowledge doctrine." *Id.*

Accordingly, the Court finds that the Peekskill Defendants are not entitled to qualified immunity on Plaintiffs' unlawful investigatory stop, false arrest, false imprisonment, and unlawful search and seizure claims under the collective knowledge doctrine.

## C. Punitive Damages

Defendant Budde asserts that Plaintiffs' claims for punitive damages should be dismissed because "there is no evidence whatsoever that [he] was motivated by malice, evil intent, or reckless or callous indifference to Plaintiffs' federally protected rights." (Docket No. 63 at 22). The Peekskill Defendants similarly argue that they did not "act[] with malice sufficient to support punitive damages." (Docket No. 52 at 17). Plaintiffs contend that at this stage of the

litigation, "the propriety of punitive damages may not be decided as a matter of law" and that the question of punitive damages should go to a jury. (Docket Nos. 57 at 28; 68 at 32).

"While compensatory damages compensate a plaintiff for a concrete loss suffered as a result of a defendant's conduct, punitive damages 'are aimed at deterrence and retribution.'" *Aquavit Pharm., Inc. v. U-Bio Med, Inc.*, 19-CV-3351 (VEC)(RWL), 2023 WL 2396511, at *15 (S.D.N.Y. Feb. 17, 2023), *report and recommendation adopted sub nom. Aquavit Pharms., Inc. v. U-Bio Med, Inc.*, 2023 WL 2584198 (S.D.N.Y. Mar. 21, 2023) (quoting *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 416 (2003)). "'An award of punitive damages' therefore 'is not a matter of right but is within the discretion of the trier of the facts and will depend upon the degree of wanton and willful conduct of the defendant.'" *Id.* (quoting *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974)).

"Punitive damages may be awarded in a § 1983 action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 121 (2d Cir. 2006) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). "To be entitled to an award of punitive damages, a claimant must show a 'positive element of conscious wrongdoing.'" *Id.* (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 538 (1999)). "The plaintiffs' evidence need only be enough 'to permit the factfinder to infer that the responsible official was motivated by malice or evil intent or that he acted with reckless or callous indifference.'" *Cameron v. City of N.Y.*, 598 F.3d 50, 69 (2d Cir. 2010) (quoting *New Windsor*, 442 F.3d at 122).

As discussed, *supra* Section III.A, there are significant factual disputes with respect to whether Defendant Budde and the Peekskill Defendants violated Plaintiffs' Fourth Amendment

- 51 -

rights.  Plaintiffs' claims must first be resolved by a jury before punitive damages can be considered.  Thus, whether Defendants' conduct warrants punitive damages remains a question "within the discretion of the trier of the facts." *Flaks*, 504 F.2d at 707.  Accordingly, the Court denies Defendants summary judgment on Plaintiffs' claim for punitive damages.

## IV.  CONCLUSION

For the foregoing reasons, Defendant Budde's and the Peekskill Defendants' motions for summary judgment are each denied in their entirety.

The Clerk of Court is respectfully requested to terminate the pending motions (Docket Nos. 49, 61).

Dated: January 15, 2026
      White Plains, New York

**SO ORDERED:**

JUDITH C. McCARTHY
United States Magistrate Judge